ARNOLD CHEKOW and NATALIE CHEKOW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent KANTOR, SHAW & DAVIDOFF, P.C. (formerly Kantor, Shaw & Chekow, P.C.), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chekow v. Commissioner
Docket Nos. 9869-76, 9935-76.
United States Tax Court
T.C. Memo 1978-330; 1978 Tax Ct. Memo LEXIS 185; 37 T.C.M. (CCH) 1364; T.C.M. (RIA) 78330; August 21, 1978, Filed Sidney N. Solomon, for the petitioners in docket No. 9869-76. Herbert C. Kantor and Robin N. Wolfe, for the petitioner in docket No. 9935-76. Jack H. Klinghoffer and Michael A. Zimmerman, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a deficiency in Federal income tax for 1973 in the amount of $ 2,533 against petitioners Arnold and Natalie Chekow, and a deficiency in income tax for *186 the tax year ended October 31, 1973, in the amount of $ 2,014.10 against petitioner Kantor, Shaw & Davidoff, P.C. The two cases were consolidated for trial. After concessions by the Chekows and the corporate petitioner, the sole issue remaining for decision is whether certain payments by Kantor, Shaw & Davidoff, P.C., to Arnold Chekow upon his termination of employment were compensation for services, or were in redemption of a stock interest in the corporation. FINDINGS OF FACT Some of the facts and exhibits have been stipulated and are incorporated herein by this reference. At the time their petition in this case was filed, petitioners Arnold and Natalie Chekow, husband and wife, resided in Douglaston, New York. Natalie Chekow is a party solely by virtue of having filed a joint return with her husband for 1973. Arnold Chekow will sometimes hereinafter be referred to as "petitioner Chekow" or "Chekow". Petitioner Kantor, Shaw & Davidoff, P.C. (formerly Kantor, Shaw & Chekow, P.C., and Kantor, Shaw & Ryan, P.C.) (hereinafter referred to as "K, S & D") is a professional service corporation organized under the laws of New York engaging in the practice of law. At the time *187 its petition in this case was filed, its principal place of business was New York, New York. K, S & D filed a corporate income tax return for its taxable year ended October 31, 1973, with the Brookhaven Service Center, Internal Revenue Service, Holtsville, New York. Petitioner Arnold Chekow was employed by the law firm K, S & D as an attorney from 1966 until April 30, 1973. When Chekow joined the firm it was a partnership called Kantor, Shaw and Ryan. The partners of the firm were Herbert C. Kantor and Donald H. Shaw, who were "senior partners". J. Richard Ryan was a "junior partner". Arnold Chekow was hired as an employee. In 1969, Arnold Chekow was admitted as a "junior partner" in the law firm and the partnership sent notices to its clientele of his admission to the firm. The partnership returns filed by the partnership showed that the two senior partners had distributive shares of the profits in the ratio of 62-1/2 percent to Herbert C. Kantor, and 37-1/2 percent to Donald H. Shaw. The junior partners were shown to have no distributive share in the profits of the partnership, other than a guaranteed salary and a bonus unrelated to profits. The status of junior partner *188 was granted by the partnership to improve an attorney's standing in dealing with partnership clients. Petitioner Chekow did not make any contribution of money or other property to the partnership (or to any of the other partners) upon his being named a junior partner. On October 26, 1970, the law partnership Kantor, Shaw and Ryan filed a Certificate of Incorporation under N.Y. Bus. Corp. Law sec. 1503 (McKinney Supp. 1977) as a professional service corporation. Petitioner Chekow prepared the certificate at the request of Herbert C. Kantor. The certificate provided that the name of the corporation was to be Kantor, Shaw & Ryan, P.C. The issuance of a maximum of 200 shares of capital stock was authorized. The certificate identified the "original shareholders, directors and officers" as Herbert C. Kantor, Donald H. Shaw, J. Richard Ryan and Arnold Chekow. Kantor was named president, Shaw secretary, and Ryan and Chekow vice presidents. The Certificate of Incorporation contained an affirmation under the "penalties of perjury" that the statements contained therein were true. It was signed by Messrs. Kantor, Shaw, Ryan, and Chekow. On October 31, 1970, a *189 meeting of the incorporators of Kantor, Shaw & Ryan, P.C., was held. Messrs. Kantor, Shaw, Ryan, and Chekow were elected directors. The newly-elected directors were authorized to issue shares of the corporation, and corporate bylaws were adopted, one of which required that directors be shareholders. Corporate formalities were not strictly observed thereafter by the corporation. The new corporation commenced doing business on November 1, 1970. Messrs. Kantor, Shaw, Ryan, and Chekow were its employee-attorneys. [1] The assets of the Kantor, Shaw and Ryan partnership became the assets of the new corporation. Petitioner Chekow was not asked to make and did not make a capital investment in the corporation at the time of its formation. Chekow had not obtained any new clients for the firm through his own efforts up to the time of incorporation of the partnership. J. Richard Ryan left the employ of K, S & D *190 in 1971, and the name of the law firm was thereafter changed from Kantor, Shaw & Ryan, P.C., to Kantor, Shaw & Chekow, P.C., by an amendment to the Certificate of Incorporation filed with the New York Secretary of State in early February 1972. After the corporation was formed, it adopted pension and profit sharing plans covering its employee-attorneys. The plans provided for vesting of a participant's interest at the rate of 10 percent a year. When Ryan left the firm, he had accumulated no vested rights in the pension and profit sharing plans, and therefore forfeited his entire interest in the plans. Ryan received no payments from the corporation for any share in the equity of the corporation, or as reimbursement for amounts he forfeited under the plans. Petitioner Chekow soon became concerned that he might suffer similar forfeitures of portions of his accounts in the pension and profit sharing plans should he cease to practice law with K, S & D. In order to prevent this, an agreement (hereinafter "termination payment agreement") dated February 1, 1972, was drafted by Chekow and executed by Herbert C. Kantor, Donald H. Shaw, and Chekow. It provided: Reference is made to *191 the Kantor, Shaw & Ryan, P.C. Pension and Profit-Sharing Plans (the "Plans") It is agreed by Kantor, Shaw & Ryan, P.C. (the "corporation") and the undersigned individual parties as follows: Should any of the individual parties hereto leave the employ of the corporation for any reason whatsoever, voluntarily or otherwise, and if by reason of such leaving there would be a forfeiture of any sums accumulated for the benefit of such departing person in the Plans, then, and in that event the corporation or the remaining shareholders, as the case may be, shall pay to such departing person, upon his departure, as an addition to the purchase price of his shares of stock in the corporation an amount equal to the amount forfeited under the Plans. (Emphasis added.) The K, S & D stock record book indicated that certificates for shares of K, S & D stock were issued for the first time on February 10, 1972, 125 to Herbert C. Kantor and 75 to Donald H. Shaw. According to the stock record book, no certificates for shares were ever issued to petitioner Arnold Chekow or J. Richard Ryan. K, S & D has never issued more than 200 shares of capital stock, the maximum number of authorized shares. *192 In December 1972, Chekow borrowed $ 6,000 from the K, S & D pension trust and $ 4,000 from the K, S & D profit sharing trust with interest at the rate of 7-1/2 percent per annum. When Kantor advised Chekow that applicable regulations of the Internal Revenue Service required that the loans be collateralized, Chekow responded that he had no property to pledge.Kantor thereafter agreed to and did personally guarantee repayment of the loans, which he thought would satisfy the regulations. Chekow did not pledge as collateral any K, S & D stock or any rights he might have had to receive payment in exchange for K, S & D stock. [2]
Petitioner Arnold Chekow terminated his employment with K, S & D on April 30, 1973. Shortly before Chekow's departure, Chekow and K, S & D (by Herbert C. Kantor) negotiated their respective rights. Chekow executed a document drafted by Kantor dated *193 April 29, 1973, assigning to K, S & D Chekow's right, title and interest in office furniture owned by him, and in the pension and profit sharing trusts. Furthermore, Chekow assigned to the firm "any and all rights to capital stock" of K, S & D. Kantor and Chekow agreed that Chekow was owed the following amounts from K, S & D and its pension and profit sharing plans: (1) Purchase price of office
furniture
$ 314.00
(2) Sundry lawyers service
expense
17.32
(3) 25% of fee from Chekow
client Matthew, Sherman &
Cullen
169.00
(4) Vested portion of pension
trust benefit
1,221.80
(5) Vested portion of profit
sharing trust benefit
1,024.86
(6) Nonvested portion of pen-
sion trust benefit
4,887.21
(7) Nonvested portion of pro-
fit sharing trust benefit
4,099.44
Total due to Chekow
$ 11,733.63
Item (1) represented the price of office furniture owned by Chekow which was to be purchased by K, S & D. Item (2) represented reimbursement of an advance made by Chekow for a firm client. Item (3) represented 25 percent of the gross fee from a client whose business was brought to the firm by Chekow. This item was paid under an agreement to specially compensate *194 Chekow for new business brought to the firm. Items (4) and (5) were vested amounts due Chekow from the K, S & D pension and profit sharing plans. Items (6) and (7), totaling $ 8,986.65, were amounts payable by K, S & D to Chekow under the February 1972 termination payment agreement. The entire sum due Chekow was in fact paid or applied for his benefit upon his termination. During the period November 1, 1972, to April 30, 1973, petitioner K, S & D paid to petitioner Arnold Chekow, as an officer, the sum of $ 15,000 as regular salary. On its return for the taxable year ending October 31, 1973, petitioner K, S & D deducted as compensation paid to Arnold Chekow his regular salary ($ 15,000), plus an additional amount of $ 9,156. The $ 9,156 additional deduction included the payments made upon Chekow's departure pursuant to the termination payment agreement [3] ($ 8,986.65, rounded to $ 8,987), plus the amount paid Chekow as special compensation for securing a new client, ( $ 169). [4] K, S & D argues that this $ 9,156 is deductible as additional compensation in the nature of severance pay. *195 In schedule D of his 1973 joint return, petitioner Chekow reported a long-term capital gain of $ 9,192 from sale of an asset denoted as "Kantor & Shaw, Inc." [5] No reference to stock or to a particular number of shares was made. This capital gain was claimed by Chekow in respect of the payments characterized by K, S & D as severance pay. Chekow argues that the payments in question were not severance pay but were received in redemption of an alleged stock interest in K, S & D owned by him. The Commissioner, in order to protect the revenues, took inconsistent positions. In K, S & D's case, the Commissioner disallowed $ 9,155 of the amount deducted as compensation to Chekow [6] on the ground that that sum was not an ordinary and necessary business expense but was a nondeductible amount paid in redemption of Chekow's shares in K, S & D. In Chekow's case, the Commissioner reclassified the $ 9,192 capital gain reported by Chekow as ordinary compensation income. On brief however, the Commissioner takes the position that the latter *196 characterization is the correct one. [7]
OPINION The parties are in agreement that if the payments at issue were compensation, they are ordinary income to Chekow and deductible by K, S & D under section 162, I.R.C. 1954, and that if the payments were made to redeem Chekow's shares in the corporation, they are reportable as capital gain to Chekow, and are nondeductible by the corporation. Thus, the only matter in dispute is purely factual: whether Chekow was in fact a shareholder of K, S & D, and if so, whether the payments in question were made to redeem his stock. Although there is conflicting evidence in the record, *197 we conclude that Chekow was not a shareholder and that the disputed payments were not made to purchase any alleged stock interest in K, S & D. In respect of the $ 169 paid Chekow for obtaining a new client, we find that this payment was not made in exchange for any part of Chekow's alleged stock interest. Chekow's own testimony confirmed that he made an arrangement with K, S & D to receive a special bonus for production of new business after it became clear that K, S & D denied his shareholder status. [8] From this we conclude that K, S & D agreed to pay the bonus only in Chekow's capacity as an employee, and not in his alleged shareholder capacity. The bonus for securing new business was therefore ordinary income to Chekow, deductible by K, S & D as compensation. Sections 61, 162(a)(1). The more difficult question involves the payment to Chekow under the termination payment agreement. We list some of the factors which lead us to *198 conclude that Chekow was not a shareholder of K, S & D, and that the payment in question was not in exchange for his alleged stock interest. The termination payment agreement itself is perhaps the heart of this case. Chekow characterizes it as a stock purchase agreement, but we cannot agree that it was intended to value any stock held by Chekow. First, we think that amounts an employee forfeited under a corporation's retirement plans would not likely be utilized as a "measuring device" for valuation of stock. The payments called for by the agreement would decrease with each year of additional vesting, and could not correlate with increases in the value of K, S & D assets. There is no evidence that amounts forfeited under K, S & D retirement plans would themselves affect the worth of K, S & D assets or its stock. This suggests that the purpose of the agreement was not to value K, S & D stock. [9] Other provisions characteristic of stock purchase agreements are not to be found in the termination payment agreement. No method for computing the balance of the purchase price of the shares was specified. Payment under the agreement was not contingent upon ownership of stock at the time *199 of one's cessation of employment. These factors point to the conclusion that the termination payment was unrelated to the redemption price of any shares held or to be acquired by Chekow. The facts surrounding the departure of J. Richard Ryan, the event precipitating the termination payment agreement, shed much light on petitioner Chekow's status with the firm. Ryan, like Chekow, was a "junior partner" in K, S & D when it was a partnership, was listed in the Certificate of Incorporation as a "shareholder", and had his name in the firm title at a time when Chekow's was not. Chekow testified *200 that both he and Ryan were shareholders, but the fact is that Ryan was not paid for any equity interest when he left K, S & D. This suggests rather persuasively that Ryan was never a shareholder. Chekow did not adequately explain how his position in the firm was materially different from that of Ryan. We are also influenced by the relatively small amount Chekow was paid when he departed ($ 9,156), compared to Chekow's claimed ownership interest in K, S & D (25 percent), and the net worth of K, S & D (approximately $ 73,000), as of April 30, 1973. [10] Chekow's explanation of his failure to be paid an amount approximating his share of the net worth was unconvincing. Chekow testified that he was allowed to take certain firm clients in lieu of being paid additional amounts for shares, but no corroboration of his testimony, such as the list of clients involved, was offered. He also did not report the value of the alleged transfer of clients as part of his capital gain in 1973. Several additional factors buttress our conclusion that Chekow was not a shareholder. Chekow made no capital contribution to K, *201 S & D, and produced little or no new business for the firm. Furthermore, no stock certificates were ever issued to Chekow. Certificates representing all of K, S & D's authorized stock were eventually issued to Kantor and Shaw in the same ratio as the profit shares held by each in the predecessor partnership, according to the K, S & D partnership returns and Kantor's testimony. The certificates were dated some 15 months before Chekow's departure. This time sequence makes it unlikely that the shares were issued in anticipation of this dispute. [11] Finally, we think that Kantor would not have agreed to personally guarantee repayment of Chekow's loans from the K, S & D pension and profit sharing plans if Chekow owned shares of K, S & D stock that could have been pledged as security for the loans. *202 To be sure, the Certificate of Incorporation, the termination payment agreement, and the April 29, 1973, assignment of "any and all" of Chekow's stock rights are some support for Chekow's claim to be a shareholder. However, these documents do not themselves convey stock to Chekow. They are consistent with Kantor's testimony that Chekow was only a proposed shareholder, and that a decision by Kantor and Shaw not to make Chekow a shareholder caused Chekow's departure. On the basis of the entire record, we find that K, S & D never in fact took any action to make Chekow's expectation of becoming a shareholder a reality. Accordingly, the payments received by Chekow upon his termination of employment were not in exchange for stock, but were compensation for past services in the nature of severance pay. Cf. Beggy v. Commissioner,23 T.C. 736, affirmed, 226 F.2d 584 (C.A. 3). In order to take into account petitioner's concessions in the K, S & D case and to recompute the deficiency in the Chekow case to reflect the correct amount received by Chekow, see footnote 7, supra, Decisions will be entered under Rule 155. Footnotes
1. A person named Siegeltuch had formerly been associated with the partnership as a junior partner, but it is unclear from the record whether he departed the firm before or after incorporation of the partnership. Upon his departure, no funds were paid to him by the firm.↩
2. Chekow did, however, assign as security his rights in the corporation's pension and profit sharing plans, and his right to be paid by the corporation for any amounts which he "otherwise would have forfeited under" the pension and profit sharing plans (presumably under the termination payment agreement).↩
3. The sum of items (6) and (7), supra,↩ p. 9. 4. Item (3), supra, p. 9. The corporation did not deduct as compensation to Chekow any of the other amounts designated items (1), (2), (4) or (5), supra↩.
5. The return states that Chekow's holding period commenced on January 1, 1972, and terminated in April 1973, and that the asset had a zero basis.↩
6. The amount of disallowed salary deduction is one dollar less than the $ 9,156 amount deducted by K, S & D in addition to Chekow's regular $ 15,000 salary. ↩
7. There is a discrepancy between the deduction claimed by K, S & D as severance pay ($ 9,156) and the amount reported as capital gain by Chekow ($ 9,192). Chekow does not explain this discrepancy. On the basis of evidence in the record concerning the amounts paid or applied to Chekow's benefit upon his departure, we find that the amount of $ 9,156 is to be regarded as the amount properly in controversy.↩
8. Chekow testified that the bonus arrangement was made during a period shortly before his departure when he "realized that [he] wouldn't be getting anything [i.e., payments for stock] over and above the basic agreement on the salaries."↩
9. The payments here are quite different from those involved in Steffen v. Commissioner,69 T.C. 1049, cited by Chekow. In Steffen, payments by a professional corporation to a departing shareholder-employee based upon the amount of corporate accounts receivable were found to be stock purchase payments and not a substitute for salary. The measuring device for pricing the shares in Steffen,↩ unlike that used in this case, was one based on the value of the corporation's assets, clearly a highly relevant factor in valuation of shares of a professional service corporation.
10. This figure was supplied by Kantor and was not disputed by Chekow.↩
11. We discount Chekow's testimony that a certificate was actually issued to him upon his departure and was immediately endorsed to the corporation, which certificate was later removed from the corporate records by Kantor. If certificates were in fact issued to Chekow, we think that he would have referred to a specific number of shares in his testimony and when reporting capital gain in his 1973 return.↩